# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 9, 2013

## CARLOS KENNEDY v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Chester County**
No. 08-CR-24     Donald Allen, Judge

**No. W2012-00211-CCA-R3-PC  -  Filed May 30, 2013**

The petitioner, Carlos Kennedy, appeals the denial of his petition for post-conviction relief. The petitioner is currently serving an effective sentence of thirty-five years in the Department of Correction following his convictions for rape of a child, attempted rape of a child, assault, and coercion of a witness. On appeal, he contends that the post-conviction court erred in denying him relief because he was denied his right to the effective assistance of counsel at trial. Specifically, he contends that trial counsels were ineffective by: (1) failing to consider moving for a change of venue; (2) failing to interview all fact witnesses; (3) failing to file important pre-trial motions; and (4) failing to utilize an expert witness. Following review of the record, we discern no error and affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and JEFFREY S. BIVINS, JJ., joined.

G.W. Sherrod, III, Henderson, Tennessee, for the appellant, Carlos Kennedy.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; James G. Woodall, District Attorney General; and Brian M. Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Procedural History and Factual Background

The following relevant facts underlying the petitioner's convictions, as stated in this court's direct appeal opinion, are as follows:

Dr. Lisa Piercy, an expert in the areas of pediatrics and child abuse, testified that on January 17, 2008, she examined the victim, age eight, at the Madison County Child Advocacy Center. Dr. Piercy said the victim disclosed that she was inappropriately touched by [the petitioner] at their home in Chester County. Dr. Piercy said the victim began living at that home in December of 2007. Dr. Piercy offered the following testimony regarding the sexual abuse described by the victim:

I always write down direct quotes and [the victim's] quote was: "He stuck his private part in my butt and on my too-too. He rubbed my too-too with his hand. I had to suck his private part and that stuff would come out in my mouth and I would have to go brush my teeth." I asked her what kind of stuff came out and she said that gooey white stuff. Then she spontaneously added that [the petitioner] would make her go get the Vaseline, lotion or Desitin so that he could put that on his private part before he stuck it in her butt. She recollected that that hurt when he did that and that sometimes she would have trouble holding the poop and pee in.

Dr. Piercy said the victim asked her to draw a picture of a female genitalia. Upon drawing the picture, the victim marked with a pen where she was touched by [the petitioner]. . . . In addition, the victim "spontaneously . . . drew a picture of a penis as well [as] stick figurines with emphasized genitalia." Dr. Piercy said the victim also "drew a small stick figurine and a large stick figurine with dark marks and emphasis on the genitalia of both and she said, 'That's me and that's [the petitioner].'" Dr. Piercy testified that the victim's ability to provide specific details of sexual activity suggested that her credibility was good and that she had personal experience.

Dr. Piercy testified that she also spoke with the victim's mother, Rachel. Dr. Piercy stated:

When I asked [the victim's] mother about how she found out about the event or events, mother said that on January the 10th, she heard [the victim] crying from another room and knew that Carlos was spanking her for loosing [sic] a set of car keys. When she went into the room that they were in, she said that Carlos was beating her butt with a belt and had her panties and pants pulled down. She reported that Carlos was very angry and

tearing up her toys and throwing them and yelling at her because she had lost the car keys. Mom then said that [the victim] then yelled back that if you don't stop, I'm going to tell mom what you did to me. Mom reports that [the victim] went on to say that Carlos sticks his dick in me. Mom said that [the victim] had also told her that Carlos had sex in her butthole while she was on all fours and then named different rooms of the house that that had occurred in.

Dr. Piercy said she did not ask Rachel how the victim learned the word "dick."

Dr. Piercy testified that she conducted a physical examination of the victim. She found that the victim had a "tear through the hymen all the way to the base of the vagina[.]" The victim also had a "whitish thickened scar" on her anus. Dr. Piercy testified that these findings were extremely abnormal and consistent with what the victim said occurred. Dr. Piercy stated:

My conclusions was [sic] sexual abuse based on the findings of the full thickness transection in the posterior rim or bottom half of the hymen as definitive evidence of blunt force penetrating trauma to the vagina. Additionally, the lesion on the anus is consistent with scar formation indicating chronic anal penetration.

. . . .

On cross-examination, Dr. Piercy testified that the victim's use of the word "dick" was uncommon given her age. She did not recall asking the victim about her past exposure to adult sexual interaction. Dr. Piercy said the victim told her that the last incident of sexual abuse occurred when she was seven. The victim turned eight on December 29, 2007. Dr. Piercy was unsure when the scar on the victim's anus developed. She did not search the victim for the presence of DNA evidence because such an examination must be performed within 72 hours of sexual contact. Dr. Piercy said the injuries suffered by the victim could have been caused by digital penetration.

The victim testified that she received a "bad touch" from Kennedy while living in Chester County in the early part of January of 2008. She was watching a movie in the living room with Kennedy when he started to "pinch and squeeze" the inside of her vagina and anus with his hand. Kennedy

-3-

touched her about twenty times. The victim then walked to her bedroom. She said Kennedy followed her and asked to put his penis inside of her. The victim said "no" and started to cry. She stated, "I had to say no four times for him to get out." The victim testified that Kennedy referred to his penis as his "dick."

The victim told Rachel about the incident three days after it occurred. The victim said she waited three days because she worried about getting into trouble. She said Kennedy threatened to kill her and Rachel if the victim told anyone about the incident. The victim eventually told her mother about what transpired after an argument with Kennedy. That night, the victim heard Kennedy hit Rachel about five or ten times outside of her room. She stated, "I just knew he hit her because I heard them arguing and pushing around." The victim said Rachel called the police the next morning.

On cross-examination, the victim again described the night that she was raped in Chester County. The victim was lying on the couch with Kennedy when he started to rub inside of her clothes with his hand. The victim got off the couch and sat on the floor. Kennedy told her to come back to the couch, and he began touching her again before she went to her bedroom. Defense counsel asked, "He did not stick his penis in your butt; correct?" The victim responded, "Yes, ma'am." Defense counsel did not further question the victim about whether Kennedy penetrated her with his penis on that night.

Rachel testified that she married Kennedy in 2005. From December of 2007 to January of 2008, they rented a house in Chester County. Rachel testified that on January 10, 2008, the victim disclosed for the first time that she was raped by Kennedy. Earlier that day, Rachel and Kennedy searched the home for misplaced car keys. Rachel said the victim was the last person to handle them; therefore, Kennedy thought she was responsible for losing them. While searching for the keys, Rachel heard the victim crying and screaming. Rachel went into her bedroom and saw Kennedy spanking the victim. Rachel stated that Kennedy "had spanked her so hard that it left marks that were bleeding." Rachel started to argue with Kennedy. She stated:

> I went in the other children's room which was caddy corner to her room and . . . Carlos came out and he said, you know, I think [the victim] hates me and I said, "No, she doesn't." He said, "I just have a feeling that one day she's going to come up with some bull crap."

-4-

Upon further questioning, Rachel clarified that Kennedy actually said, "'Some bullshit like I molested her or something to get me in trouble one day.'" Rachel was surprised by this statement, and she and Kennedy went to speak with the victim. The victim threatened to reveal what Kennedy had done to her. When Rachel questioned the victim about what Kennedy had done, the victim said, "'He sticks his dick in me.'" Rachel stated:

> I just kept saying, "What are you talking about?" And Carlos just said, "See. I told you. I told you she was going to do this one day." And he walked out of the room and I grabbed [the victim] and I took her outside on to the carport.

Rachel believed that the victim was telling the truth. Rachel stated, "Carlos is not circumcised and so the way [the victim] described his private parts was exactly that." Rachel took the victim to her room and locked the door. Rachel said Kennedy was extremely upset. He yelled at Rachel and threw various objects around the house. Kennedy also threatened to kill Rachel and the victim if they told anyone about what occurred. Rachel believed that Kennedy's threat was serious.

On cross-examination, Rachel said she told the victim that she was sexually abused as a child by her father. This conversation occurred after the victim revealed she was sexually abused by Kennedy. Rachel disclosed her own past abuse because she did not want the victim to feel embarrassed or to believe that the abuse was her fault. Rachel said the victim never bathed with Kennedy. Rachel testified that she was afraid to call the police because of the threats made by Kennedy.

Gwen Arnold testified that she was Rachel's mother and the victim's grandmother. The victim lived with Arnold on two separate occasions for a "very short time." Arnold once saw the victim "[t]ouching herself" in the bath tub. She recalled Rachel having multiple relationships prior to dating Kennedy.

On cross-examination, Arnold testified that she had "a lot of interactions" with the victim while the victim lived with Kennedy. Arnold said the victim once asked her about sexual matters. Arnold stated that the victim "started saying things that I thought, 'Oh, my goodness. This is not what an eight year old girl needs to know.'["] The victim asked about the meaning of the word "dick." The victim did not tell her where she learned about such

-5-

sexual matters. Arnold said the victim was terrified of Kennedy, and Arnold described Kennedy as very controlling. She was concerned that the victim had been sexually abused. She also believed that Kennedy beat the victim because she had bruises.

Kennedy denied that he sexually molested the victim. He first met the victim when she was four years old, and he provided financial support for her during his relationship with Rachel. He testified that the victim told lies in the past that led to arguments between him and Rachel. Kennedy and Rachel spanked the victim when she needed to be disciplined. On the night of the alleged sexual abuse, Kennedy said he and the victim were watching a movie in the living room at around 10:00 p.m. The movie ended at around midnight, and the victim went to her bedroom.

On a later date, Kennedy was not able to locate his keys. He and Rachel concluded that the victim had the keys last. Kennedy told the victim to help look for the keys. When she stopped looking, Kennedy took her into a bedroom and threatened to spank her. He said the victim became extremely upset, and she claimed she did not love Kennedy. He decided not to spank the victim. Kennedy and Rachel had a conversation with the victim during which the victim said, "'I'm going to tell Rachel what you've been doing to me.'" The victim then claimed Kennedy had "been sticking his dick in me." Kennedy said he never heard the victim use the word "dick" before. Kennedy denied threatening to kill the victim or Rachel.

*State v. Carlos Kennedy*, No. W2009-00004-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 688, *2-12 (Tenn. Crim. App., at Jackson, Aug. 18, 2010).

Following a trial, a Chester County jury found the petitioner guilty of rape of a child, attempted rape of a child, assault, and coercing a witness. *Id*. at *12. He was subsequently sentenced to an effective term of thirty-five years in the Department of Correction. The petitioner filed a direct appeal to this court claiming that: (1) the evidence was insufficient to support the conviction for rape of a child; (2) the trial court erred by prohibiting defense counsel from questioning the victim and her mother about a prior allegation of sexual abuse made by the victim; and (3) consecutive sentencing should not have been applied. Following review of the record, this court affirmed the convictions and sentences as imposed. *Id*. at *30.

Thereafter, the petitioner filed a timely pro se petition for post-conviction relief alleging, among other grounds, that he was denied his right to the effective assistance of

-6-

counsel. Counsel was appointed, but no amended petition was filed in the case. A post-conviction hearing was held, at which the petitioner and the two attorneys who represented him at trial testified.

The first witness called was an assistant public defender who served as the petitioner's co-counsel during his trial. While making it clear that her role in the representation of the petitioner was that of "second chair," co-counsel testified that she reviewed all discovery materials, met with trial counsel on several occasions to discuss the case, met with the petitioner on two or three occasions, and interviewed witnesses. She stated that she spent more time on this case in preparation because from a defense standpoint, it was a "nightmare." Co-counsel testified that, despite her best efforts, she was unable to interview some witnesses because they refused to speak with her. Co-counsel specifically mentioned the victim, her mother, several DCS workers, and the State's expert in the case, Dr. Piercy, as witnesses she was unable to speak with prior to trial. She, nonetheless, testified that she did have access to Dr. Piercy's report and made a thorough review of its contents. Co-counsel testified that she believed that she and trial counsel had done a full pre-trial investigation in the petitioner's case.

When questioned regarding a change of venue, co-counsel testified that the subject was never discussed during the case. Co-counsel stated that she was a resident of the county, subscribed to the newspaper, and watched local news channels. Based upon her recollection, there was not excessive media coverage of the case. She herself had not heard of the case until it was assigned to the public defender's office, affirming her conclusion that there was not much pre-trial publicity. Co-counsel did acknowledge that she did not conduct a formal investigation of the area media outlets to discover if the case had been covered.

With regard to utilizing a defense expert, co-counsel testified that no funding would have been available for the petitioner's case. She explained that funding for defense expert witnesses was very limited and that the petitioner's case did not fall into the category which would warrant such funding. She testified that she and trial counsel used their discretion in making the determination that funding would not be granted and did not request it from the court. Moreover, co-counsel testified that there was really no purpose in obtaining their own expert as the petitioner was not contesting that the child had been abused, but only that someone else had committed the crime. Thus, any expert obtained would find physical damage to the victim. The State's own expert, Dr. Piercy, also specifically testified at trial that she was unable to determine when the damage occurred to the victim.

Co-counsel also recalled a "hotly contested" issue in the petitioner's case over admission of a prior allegation of abuse by the victim pursuant to Tenn. R. Evid. 412. Co-counsel testified that the problem with introducing the report was that the investigation had

concluded that no sexual contact had occurred, a finding different from the physical evidence that would be introduced in this case. Nonetheless, she and trial counsel argued for admission of the evidence. The trial court informed them, however, that if they pursued admission, it would open the door to charges of a similar nature which were pending against the petitioner in another county. Because they felt that opening the door to this evidence would not be in the best interest of the petitioner, co-counsel and trial counsel made the strategic decision not to pursue admission of this report. Nonetheless, co-counsel did try to show through other testimonial evidence that there had been several opportunities for other individuals to have harmed the victim.

Despite her and trial counsel's discussions of other possible defenses, the petitioner was insistent that the only theory of defense which he would pursue was that the child had been previously sexually abused thereby causing the physical damage and that she had only made the instant allegations because she was mad at him for disciplining her. According to co-counsel, the petitioner was also insistent that the victim's grandmother, Gwen Arnold, be called as a witness. Ms. Arnold had given statements to the Department of Children Services which indicated that the victim's mother was an unfit parent. Co-counsel testified that she was unable to interview Ms. Arnold prior to trial but did review her statements in preparation and believed she might be able to discredit the victim's mother. While they were able to get into evidence that the victim's mother's lifestyle had provided ample opportunities for prior abuse, Ms. Arnold was a very damaging witness on cross-examination.

Co-counsel testified that she was unable to locate any other possible character witnesses to testify for the defense. The petitioner suggested his mother be called, but, upon speaking with her, it became clear that she would not be able to offer useful testimony. Moreover, she refused to attend the trial, stating that she had problems in the past with the petitioner doing these kinds of things and could do nothing to help him. Co-counsel could not recall the petitioner suggesting any possible witnesses other than Ms. Arnold and his mother.

Trial counsel also testified at the hearing and stated that she was appointed to represent the petitioner in general sessions court. Because it was her first jury trial by herself and because of the seriousness of the case, she consulted with co-counsel who then assisted her with the case. Trial counsel testified that a great deal of time was spent on case preparation, and she believed that the petitioner was given the best representation possible considering the evidence against him. She was present for witness testimony at the preliminary hearing including that of the victim, her mother, and a police officer. Trial counsel was also able to attend a hearing in the separate juvenile matter, during which she was able to observe the testimony of Dr. Piercy. She attempted to speak with several witnesses, but most refused to speak with her. She recalled that she had spoken with the

petitioner's mother about possibly testifying for the defense, but she was not helpful. At the petitioner's request, she also contacted his brother and discussed the allegations with him. The petitioner's brother adamantly denied that he himself had touched or abused the victim. Trial counsel was unable to locate the only other possible witnesses suggested by the petitioner.

Trial counsel also testified that there was no investigation made into media coverage of the case and that a motion to change venue was never considered. She testified that she remembered only one article in the local paper and that appeared around the time of the preliminary hearing, approximately five to six months prior to trial. Trial counsel testified that she felt there were no grounds on which to seek to change the venue of the trial.

Like co-counsel, trial counsel stated that it was very difficult to get a defense expert appointed based upon the nature of the case. She acknowledged that no request was made for funding for an expert. Likewise, she also stated that because the issue at trial from the defense standpoint was when, rather that if, the injuries were inflicted, a defense expert was not necessary. On the issue of when the injuries were inflicted, the State's own expert could not date the injuries, which was positive for the defense. Trial counsel also acknowledged that the decision was made not to file a Rule 412 motion for admission of the prior sexual contact alleged by the victim because of the risk of admitting the separate charges pending against the petitioner.

Trial counsel testified that Ms. Arnold refused to speak with them during their investigation, but the petitioner insisted that she be called to testify at trial. She noted that the purpose of doing so was an attempt to discredit the victim and her mother. Trial counsel stated that the direct examination of Ms. Arnold was "not too bad" but that cross "was awful." Trial counsel also noted that the petitioner had chosen to testify at trial to tell his side of the story, and he was prepped for direct examination by trial counsel.

The final witness to testify at the hearing was the petitioner himself. He stated that the issue of a possible change in venue was not discussed with him by either of his attorneys. He further stated that he was incarcerated during the period with no access to media coverage, so he relied upon his attorneys to make a determination if one was needed. The petitioner also testified that he had provided trial counsel with a list of possible defense witnesses which included his mother, his brother, and friends. Despite the fact that he presented these name to counsels, none of the witnesses were called to testify at trial. The petitioner felt that counsels did not effectively seek out these witnesses even though he gave them sufficient information to locate them. He also denied that he was informed that counsels had spoken with his mother and that she refused to testify. The petitioner also denied that he had ever insisted that Ms. Arnold be called as a witness and stated that he

personally believed that she would not have been an appropriate witness to testify because of their relationship. The petitioner did acknowledge that it was his decision to testify despite concerns expressed by his attorneys.

According to the petitioner, he believed that trial counsels had failed to zealously advocate for him during the trial. He stated that trial counsels did not understand the Rule 412 issue and failed to do their job with regard to that motion. He denied that counsels had ever explained to him the possibility of "opening the door" with regard to the Gibson County charges pending against him if they proceeded.

After hearing the evidence presented, the post-conviction court denied relief. The petitioner has timely appealed the denial.

**Analysis**

On appeal, the petitioner contends that the post-conviction court erred in denying his petition for post-conviction relief because he was denied the effective assistance of counsel. In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103 (2010); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687-88. Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

For deficient performance, the petitioner must show that "counsel's representation fell

below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 688-89. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Prejudice in turn requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Strickland*, the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. The court clarified that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. The trial court's conclusions of law on the claim are reviewed under a purely de novo standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

In its order denying relief, the post-conviction court found that the petitioner had failed to prove his claims by clear and convincing evidence. The court specifically noted that the services and advice given to the petitioner by counsels were within the range of competence demanded of criminal defense attorneys. The court further found that: "[T]he

Petitioner's attorneys conducted a full pre-trial investigation, obtained full discovery from the State, and diligently attempted to talk to the State's witnesses, as well as consulting with the Petitioner regarding his trial strategy, including any defense witnesses and his own testimony[.]"

In his appellate brief, the petitioner's issue is framed as follows:

The [post-conviction] court erred in failing to find that counsel was ineffective for[] failing to consider moving for a change of venue, failing to prepare a proper defense by failing to interview all fact witnesses, failing to file important pretrial motions, and [failing] to utilize an expert witness.

The argument section of the brief contains only a recitation of the relevant standard of review for post-conviction relief. There is no citation to the record, no citation to authorities supporting the statement, and, indeed, no argument put forth whatsoever supporting the conclusion that the court erred in making these determinations. As pointed out by the State, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." *See* Tenn. Ct. Crim. App. R. 10; Tenn. R. App. P. 27(7). The petitioner's assertion of a conclusory statement that counsels were deficient and prejudice resulted does not satisfy the requirements set forth by the court's rules. The petitioner must articulate reasons supporting his conclusions or risk waiver. Nonetheless, in the interest of finality and justice, we opt to review the petitioner's claims on this occasion.

The petitioner's first contention is that trial counsels should have moved for a change of venue prior to trial. However, the evidence presented failed to establish the need for such a change or prejudice caused by the failure to move for the change. Both trial counsel and co-counsel, who were local residents, each testified that there was not excessive publicity in the area. Trial counsel remembered only one article published in the local paper approximately five to six months prior to trial. This is not the level of mass media coverage required to warrant a change of venue. Both counsels testified that they saw no need to make a motion in this case. Regardless, the petitioner has failed to show that such coverage did in fact exist and was prejudicial to his case. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The petitioner's mere assertion that this was deficient performance does not entitle him to relief.

The petitioner's second complaint is that trial counsels failed to interview all fact witnesses. Again, the petitioner has failed to call these witnesses at the post-conviction hearing to establish what there testimony would have been had they been called at trial. That failure precludes a finding of prejudice. *Id*. Regardless, the petitioner's assertion ignores

trial counsels' testimony that they did in fact make attempts to interview all necessary witnesses. His argument ignores that witnesses are under no requirement to speak with counsel prior to trial. Moreover, trial counsel testified that she did in fact question the victim and her mother during the preliminary hearing and was familiar with their statements to authorities. Additionally, trial counsels did speak with the petitioner's mother and brother, and they were unable to offer useful testimony for the defense. Their testimony also reflected that none of the other witnesses that they were able to locate would speak with them. No deficient performance was established upon these facts.

Next, the petitioner complains that trial counsels "failed to file important pretrial motions." Although not specified, we assume that the petitioner is referring to trial counsels' decision not to file a motion pursuant to Tenn. R. Evid. 412 to allow admission of a report regarding prior allegations of abuse by the victim. From a reading of the direct appeal in this case, we glean that there was some confusion with regard to the prior allegation or that there were actually two prior allegations, one against the petitioner and one against his brother. Notwithstanding said confusion, which was not clarified at the post-conviction hearing, the petitioner has failed to meet his burden. Trial counsels testified that they chose not to pursue admission of the evidence because of the trial court's ruling, which would have allowed admission of pending charges against the petitioner in Gibson County. Co-counsel testified that admission of those charges would have been horrific for the defense. She stated it was a strategic decision made after assessment of the available options. The petitioner has not demonstrated that he is entitled to relief on this issue.

Finally, the petitioner asserts that trial counsels were deficient by failing to utilize an expert witness. Again, the petitioner has not met his burden of proof. Both trial counsel and co-counsel testified that they did not believe funding would have been available in this case for such an expert. Moreover, trial counsel specifically testified that she saw no need for a defense expert based upon the theory of the defense that the injuries occurred but were inflicted by someone other than the petitioner. The State's own expert testified that the time of infliction of the injuries could not be established. The petitioner has failed to establish what the content of the expert's testimony would have been or how it would have been beneficial to his defense had trial counsels sought such expert to testify at trial. No relief is warranted.

Our review of the record reveals nothing which preponderates against the findings made by the post-conviction court. The proof establishes that both trial counsel and co-counsel thoroughly investigated the case, examined the State's proof, attempted to interview witnesses, had discussions with the petitioner about possible defenses, and were prepared for trial. As both testified, the evidence against the petitioner was strong, and it was a difficult case from a defense standpoint. The fact that the defense strategy that the petitioner insisted

upon pursuing failed does not equate to ineffective assistance of counsel.  Relief was properly denied.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.


_____

JOHN EVERETT WILLIAMS, JUDGE